Filed 10/15/21  Riverside Community College Dist. v. Biersmith CA4/2
*See dissenting and concurring opinion.*

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RIVERSIDE COMMUNITY COLLEGE DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STEPHEN BIERSMITH,<br><br>    Defendant;<br><br>ERIC THOMPSON,<br><br>    Real Party in Interest and Respondent. | E073818<br><br>(Super.Ct.No. RIC1825186)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Chad W. Firetag, Judge.  Reversed.

Liebert Cassidy Whitmore, Pilar Morin, David A. Urban and Meredith Karasch for Plaintiff and Appellant.

No appearance for Defendant.

1

Pacific Justice Institute, Kevin T. Snider and Michael J. Peffer for Real Party in Interest and Respondent.

Real Party in Interest and respondent Eric Thompson was a tenured Sociology professor at Moreno Valley College (College), which is part of plaintiff and appellant Riverside Community College District (District). Students complained to the College that Thompson made inappropriate comments in class about women and made those who identified with the Lesbian, Gay, Bisexual and Transgender (LGBT)[1] community feel uncomfortable. Further, he sent a video about conversion therapy called *Understanding Same-Sex Attraction* (video) to all staff at the College with the subject line "The Research Continues," and showed it in his classes in the Spring 2014 semester.[2] In 2015, the District started an investigation into Thompson, which resulted in a 90-day notice of Unprofessional Conduct and/or Unsatisfactory Performance under Education Code section 87734 (90-Day Notice).

After the 90-Day Notice, students reported that Thompson continued to make disparaging remarks in the classroom regarding women. Further, a student complained that her low grade in Thompson's class was based on her sexual orientation. After she made the complaint, and an investigation had begun, Thompson sent her an email asking her to drop her complaint. The District opened another investigation, and ultimately, the

---

[1] This court is aware that this community is currently referred to as LGBTQ but the transcript only identified the group on campus as the LGBT community.

[2] Conversion therapy is a controversial method of trying to change a person's sexual orientation.

2

District determined in October 2017 to discharge Thompson. Thompson requested arbitration. After a lengthy hearing during which several of the College's students testified, and Thompson testified, the arbitrator determined that Thompson engaged in immoral conduct, was dishonest, was evidently unfit for service and refused to obey the school laws within the meaning of Education Code section 87732. However, the arbitrator found mitigating circumstances, and imposed the penalty of a 90-day suspension without pay rather than terminating Thompson's employment.

The District filed a petition for writ of mandate arguing that since Thompson was found unfit to teach, he should be dismissed (petition). The trial court denied the petition without issuing a statement of decision. The District filed this appeal from the denial of the petition.

On appeal, the District claims (1) the trial court committed reversible error by refusing to issue a statement of decision; (2) the trial court and arbitrator erred by finding that some of the charges were not supported by the evidence; (3) the trial court and arbitrator abused their discretion by finding that Thompson should only be suspended for 90 days when he should have been dismissed; and (4) the court and the arbitrator erred by finding that allegations prior to the issuance of the 90-Day Notice could not form the basis of the discipline. We reverse.

**FACTUAL AND PROCEDURAL HISTORY[3]**

A.      FIRST INVESTIGATIONS OF THOMPSON REGARDING

         STATEMENTS TO A FACULTY MEMBER AND CONVERSION

         THERAPY VIDEO

Thompson was a Sociology professor employed by the College, who, by 2014, had been teaching for over 14 years. He had been hired by the College in 2005 as a full-time professor and had tenure. Thompson had a Master's Degree in Sociology. He was married and had seven children. According to his syllabus, which he handed out to students for the classes he taught in 2014 and 2015, grades in his classes were based on exams, written assignments and participation. The accredited College consisted of over 8,500 students with 55 percent of the student body being female. The College had an ALLY program that supported the LGBT community on campus. The College had a "Diversity Committee" that was dedicated to fostering an inclusive and accessible student experience.

In 2014, Donald Foster filed a formal complaint of harassment against Thompson with the College administration. Foster, who was homosexual, was told by Thompson that the only way he would find true happiness would be to divorce his husband and beg the Lord for forgiveness. Thompson also told Foster he taught his students about

---

**3** The factual history is based on the exhibits admitted at the arbitration hearing, which included prior investigations into complaints against Thompson and the live testimony at the arbitration hearing.

conversion therapy.  Thompson sent out a link to the video on an all-faculty email service.

In 2015, an attorney, Sandra Lindoerfer, was hired to investigate the complaint. Thompson was interviewed on March 10, 2015.  He was teaching three in-person classes, and other online classes.  Thompson was asked about a complaint that had been made about him and was asked what he believed the complaint to be about.  Thompson replied that he had emailed the video around September 2014.[4]  He explained that the video "in a rather neutral way" showed the "other side" of the debate considering a person's sexual identity.  He wanted to present the opposing view.  He sent the link to the video in an email to the entire College staff and employees; it did not go to students.  He felt that conversion therapy had been "demonized" by the American Psychological Association and the American Sociological Association because it did not fit their "political interests."  He wanted to get the information out.  He did not want to hurt feelings. Thompson believed that a person who was homosexual could, according to the research, change.  Thompson also showed the video in class.

Thompson felt pressure from the president of the College to stop showing the video.  Thompson thought it was appropriate to show the video in class as it was an appropriate subject to discuss in a college class.  Thompson felt he was persecuted by

---

[4]  The video apparently used a symptom-based model for homosexuality.  It referenced that earlier events in a person's life may have caused them to have homosexual tendencies and that therapy addressing the early trauma could be used to treat homosexuality.

"radicals" on campus. Thompson agreed with the president of the College to not show the video in class just that semester.

As a result of the complaints, Lindoerfer submitted a report; the report is not part of the record. Based on the report submitted on April 1, 2015, Thompson was required to complete sensitivity training, which he completed.

B.     SECOND INVESTIGATION AND 90-DAY NOTICE

One of Thompson's students, Krista E., who was in Thompson's class in Spring 2015, made a complaint against Thompson. In June 2015, Krista was interviewed by Lindoerfer. Krista was the treasurer of the LGBT Straight Alliance (LGBTSA) Club on campus. Her daughter, who was gay, also attended the College. Krista had been told of some "issues" that Thompson may have with the gay community prior to her taking his class.

Thompson showed a video to the class about a Mormon man who was gay but married. After it was over, he told the class that he showed it to the class to show that it was possible to have these types of feelings but overcome them and have a straight, "normal lifestyle." Thompson also mentioned in class that his wife was not educated and he liked it like that so she would not go anywhere. Krista insisted that someone used the word "dyke" in the classroom and that Thompson repeated the word.

Krista told Lindoerfer that there was a time in class when he called on her when they were talking about same-sex marriage. She insisted he did not normally call on people in class. During the discussion, Thompson talked about a biological father marrying his daughter after years apart. Krista was offended that he compared

6

homosexual relations with a case involving a biological father and daughter. When students in the class started talking about lesbian women dressing like men, she left the classroom. She felt Thompson was encouraging the stereotype. She was upset that Thompson continued to question her about same-sex marriage and no one else. In July 2015, Lindoerfer interviewed several other students and faculty members.

Several students confirmed Krista left Thompson's class the day same-sex marriage was discussed. Some students did not think that Thompson was singling out Krista. Greg A. reported that someone in the classroom used the work "dyke" but Thompson never used the word; one student stated Thompson said not to use that word.

Sergio M. was interviewed on June 8, 2015. He had been a student at the College. He took two Sociology courses with Thompson. Thompson always started his classes discussing that he was the breadwinner and that his wife stayed at home, homeschooling his children. Sergio interpreted his statement to mean he thought that is how a family should be. Sergio felt that Thompson did not allow students to express their opposing views. Sergio provided that Thompson had made a diagram of the family in class which was god, man and then woman. Sergio really liked Thompson and thought that no one complained about him because he had a charming personality and his classes were easy.

Ann Pfeifle was interviewed on June 23, 2015. She was a history professor at the College. She was the advisor for the LGBTSA on campus. She had served on the "Diversity Committee" at the College. Pfeifle had complained to the Diversity Committee about Thompson. She confirmed that Krista told her Thompson discussed liking his wife to be uneducated so she would not leave him. Pfeifle had viewed the

7

video and could not watch all of it because it was very upsetting. She considered it anti-gay propaganda. It was not a neutral presentation of the issue. Another student named Erick had come to her crying over the video shown by Thompson in Fall 2014. Erick had confided in Thompson and felt that Thompson had betrayed him. Thompson used the terms "symptoms" of homosexuality. Pfeifle recommended Erick talk to Thompson. Erick spoke with Thompson about students leaving the classroom during the video. Thompson responded that they should have stayed to discuss it and they were cowards.

Victor S. was interviewed on July 28, 2015. He had been at the College since 2012. He served on the Diversity Committee. Victor thought that Thompson was great in encouraging students to participate in class but needed to keep his personal views out of class. Thompson said in class that the man came before women in all respects. Thompson oftentimes compared gay marriage to pedophiles and polygamists.

Angela J. was interviewed on July 28, 2015. Angela had been at the College for two years and was part of the Diversity Committee. She had taken two classes with Thompson. She felt he pushed his fundamentalist Christian ideals on the class. He quoted Bible scripture in class. Angela believed that when students wrote papers, he would give lower grades to the students who expressed viewpoints different than his. Thompson made it clear one day in class that women who have children should not be out of the home. Angela watched the video and it was very upsetting to her. One student, Charles, who was in class with Angela, was crying after the video and asked if something was wrong with him.

8

Dr. Robin Steinbeck was interviewed on July 21, 2015. She was an administrator at the College. One time Thompson had called her a feminist because she worked and had children at home. He told her it made her a bad mother. Dr. Steinbeck was told by other faculty they were offended by the video. On July 8, 2015, Dr. Larisa Broyles was interviewed. She was teacher at the College. She was actively involved in the Diversity Committee. She got the video from a school-wide email sent by Thompson. In the email, Thompson stated that conversion therapy was scientifically valid. After that, at a Diversity Committee meeting, several students, including Victor and Angela, complained about Thompson. Dr. Steinbeck confirmed a student named Charles had expressed that Thompson asked the class if anyone had the symptoms in the video. Charles felt forced to answer. Charles had "ambiguous" sexuality. Students stayed in Thompson's class because they felt they had to get the credit to graduate.

Thompson was interviewed again by Lindoerfer on September 3, 2015. Thompson acknowledged he showed a video in his classes about a Mormon man who had homosexual attractions but was married. Thompson showed the video in one of his classes, and Charles mentioned that he had all of the "symptoms" in the video. Thompson denied that he used the word symptoms. Thompson described Charles as being older and wearing colorful clothes. Thompson stopped showing the video after the Fall 2014 semester because he felt pressured to stop. He did not want to make the commitment to stop showing it indefinitely.

Thompson denied he ever told a female student that if she had children she should not be going to college. He also denied ever telling his students that he thought the ideal

9

family structure was the female staying at home and the male being the bread winner. He may have discussed this family structure but only in discussing cultural ideas.

Thompson gave Krista an "A" in his class. He knew she had children and a husband. He had noticed that she wore a T-shirt with LGBT on it to class. He assumed that she was sympathetic towards that "cause" or may be homosexual. He recalled she had left class abruptly during a discussion of families and same-sex marriage. He insisted he started calling on students by name in class to encourage more participation. He thought it was "immature" of her to leave class when they discussed stereotypes about lesbians including why some lesbians dress like men. Thompson thought that college students believed they had a right not to be offended.

On May 11, 2015, Thompson emailed the president of the College detailing what had occurred in the classroom when Krista walked out. Thompson referenced that the LGBT community on campus was targeting him. He ended the email by stating, "At the very least, the LGBT community needs to STOP WHINING, to GROW UP, and to realize that this is COLLEGE."

Thompson denied ever using the work "dyke" in class as it was offensive. He did not recall anyone else using the term in class.

Lindoerfer filed a report on November 9, 2015. The report addressed the impact of the video on faculty and students; how the email sending the video impacted faculty and students; whether Thompson made a comment in class that the ideal family structure was the husband as a bread winner and the wife staying home; whether he told a student

10

who had children she should stay home rather than go to college; and the impact on Krista as to comments made in class.

As for the video's impact on students, Lindoerfer was advised by students that Thompson had told his students prior to showing the video to watch for the symptoms in the video, and if they had them, they probably had a disorder. After the video, he asked the class if anyone had symptoms. Thompson denied this statement. Another student stated that Thompson only asked generally how the students felt about the video. Lindoerfer was unable to interview Charles. Lindoerfer found that there was not sufficient evidence of the statement by Thompson.

Lindoerfer concluded that showing the video caused several students in his classes and faculty members to be emotionally upset. It had such a significant impact as it was discussed by several student organizations. Thompson showed the video based on his own religious beliefs. Further, based on Thompson sending the video to Foster, and other interactions, Foster was caused anxiety and started having panic attacks. He had to take medication.

As for statements made by Thompson regarding a man being the breadwinner and women staying home, students stated that Thompson had expressed that he followed this patriarchal model in his own home. Lindoerfer relied on the reports from Krista, Victor, and Angela to conclude that Thompson had made comments derogatory toward women, including that women who have children should stay at home.

As for the complaints by Krista, Lindoerfer found that Thompson did direct questions regarding same-sex marriage to her. The evidence showed that Thompson

11

attacked Krista, who was a visible LGBT supporter, by continuing to ask questions about same-sex marriage. He was unable to argue both sides of an issue.

The District sent Thompson notice of the administration determination and a summary of Lindoerfer's investigative report. It stated, "Based on the foregoing as summarized . . . it is the District's conclusion that no violation of District Policy or Administrative Procedure occurred. However, it is imperative that you understand the fact pattern of the investigation showed that your conduct was unprofessional. Therefore, the matter has been referred to . . . Human Resources and Employee Relations for consideration of an appropriate course of action."

On March 3, 2016, Thompson was sent the 90-Day Notice. It listed the facts that supported the notice and what areas Thompson was to correct. Thompson was advised he was not to single out students or treat them differently because of their sexual orientation. Further, Thompson was advised not to make discriminatory statements on the basis of gender. Such statements degraded the educational experience of the females in his class and may deter them from pursuing education. Thompson was directed to correct the deficiencies immediately. He was not to engage in conduct that violated laws prohibiting discrimination based on protected status, including gender and sexual orientation. His performance would be monitored and the administration at the College would help him. It he continued to demonstrate these types of behavior, he would be subject to disciplinary action, including dismissal.

C.    COMPLAINTS ABOUT THOMPSON AFTER THE 90-DAY NOTICE

In June 2016, a complaint was made by Derian H. to the dean of instruction at the College that Thompson had them complete extra credit assignments in his Sociology course about "fixing being gay." She was concerned because she had written in her extra credit paper about the video that she was gay. After Thompson received the paper, Derian clamed he did not make eye contact with her and he had not given her a grade on the written assignment. She was worried about her grade.

In September 2016, Thompson was notified about the complaint from Derian. He was advised that an investigator, Kristine J. Exton, had been hired to investigate. In the letter, Thompson was advised: "You are advised that any attempt to take reprisals against, to intimidate, coerce or otherwise threaten any participant of this process constitutes unacceptable and illegal conduct and will not be tolerated. As such, you are directed to refrain from all such activities."

After receiving notice of the complaint, Thompson sent an email to Derian. He stated that his email was not an attempt to coerce or intimidate her in any way, mirroring the language of the letter. He expressed that he was disappointed that she had made a formal complaint against him. He was unaware of her sexual orientation until he received the complaint. He wrote, "So I'm asking you to kindly reconsider going forward with this. It is a hassle for me and takes away from my obligations to my current students and family (my wife is due any day now)." He further stated it would cost the taxpayers money. He then stated she had every right to proceed with the complaint. He said that he cared for all of his students and he cared for her.

13

Exton interviewed Thompson on November 15, 2016. Thompson had tried to exercise his academic freedom but a minority of the students complained about his exploring alternative ideas of sexual identity. He felt bullied and harassed by members of the LGBT community and some of the administration.

He acknowledged that he was using the video as extra credit in 2016. He did so because he did not want to give up his academic freedom. He insisted it was necessary for the class to show social constructionist perspective on sexuality. He insisted he provided another video for extra credit that showed biological reasons for homosexuality. Extra credit assignments were turned in but only given credit if the student was close to a higher grade. He sometimes handed them back but not usually.

He recalled Derian was an average student. She emailed him about her grade and he responded with her scores on everything. She had a 63 percent in the class so she did not receive the points for extra credit. His email to her about the complaint was to show he cared about her and her grade was not based on her sexual orientation. He mentioned input errors in the grade book so that she could tell him if she made any mistakes in entering her grades. He never read her extra credit assignment where she stated she was gay. He did not treat her differently after it was turned in.

Exton filed her report detailing her investigation into Derian's complaint on February 4, 2017. The question for the investigation was whether Thompson awarded Derian's grade in Sociology based on her sexual orientation. Derian refused to be interviewed. Exton reported that Derian had performed poorly on some of the examinations in the class. Any extra credit would not have improved her grade.

14

Thompson insisted he did not read Derian's extra credit assignment and was unaware she was gay until he was advised of her complaint. Exton concluded, "The preponderance of the evidence shows that it is UNFOUNDED there was discriminatory animus on the basis of sexual orientation by Professor Thompson in assigning" Derian's grade. As for whether he changed his attitude toward her in class, several students stated that they did not observe any change and Thompson stated he was unaware that Derian was gay until the complaint. The allegation was unfounded.

Exton addressed comments made by Thompson in class regarding his family and religion. Faith N. was interviewed and recalled Thompson discussing that men were superior to women, and a man should be the head of the household. She recalled the video was an extra credit assignment. Thompson encouraged the class to view the video because it contained the truth. He said homosexuality was deviant. His classes were filled with his philosophies and not book material. Thompson said in class that "whiny feminists" were ruining the world. She did not file a complaint because she was worried he would find out. David W., Vanessa S., and Michelle M. watched the video, which was extra credit, and did not know Thompson's views on homosexuality. Thompson encouraged discussions in class and listened to other viewpoints. Jessica F. stated Thompson would oftentimes connect his lecture to the Bible but it did not bother her. She knew nothing about the video. Iris I. reported that no one in Thompson's class was offended by anything he said or did. He did not talk about his personal views of homosexuality.

15

Exton stated that Thompson told her he talked about his family in class to personalize himself. He discussed his personal religious views as a way to discuss different ideologies. He believed homosexuality was caused by environmental factors and not biological but never told his students what he believed. He never said homosexuality was deviant. He admitted showing the video in his classes. Thompson felt harassed by the administration and students for trying to exercise his academic freedom. Thompson believed the video was important to his curriculum. He claimed that Dr. Steinbeck told him that it was okay to show the video as extra credit. He also added another video regarding the biological explanation of homosexuality. Thompson denied calling someone "whiny feminists" but did mention the term in class for discussion. He only emailed Derian to let her know he cared about her. Exton had reviewed the proceedings leading up to the 90-Day Notice.

Exton found that Derian's complaint that Thompson spoke in class about his religious beliefs and family was true. Exton also found that the email sent to Derian inferred that he would change her grade if she dropped the complaint.

D.    DISTRICT DECISION TO TERMINATE THOMPSON

On March 22, 2017, the District sent a letter to Thompson informing him that it was recommending to the Board of Trustees that he be terminated. A predisciplinary *Skelly*[5] review process would occur prior to the recommendation of termination.

---

[5] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206 (*Skelly*) [a hearing on the dismissal of a public employee].)

16

The District's recommendation for dismissal was based on the following violations of Education Code section 87732:  (a) Immoral or Unprofessional Conduct; (b) Dishonesty; (d) Evident Unfitness for Service; and (f) Persistent violation of or refusal to obey the school laws of the state or the reasonable regulations prescribed for the government of the community colleges.  Attached was a Statement of Charges, which discussed the investigations involving Krista, the 90-Day Notice and the investigation involving Derian.[6]  The District noted that Thompson had been advised of its policy regarding discrimination and retaliation.  Thompson filed an objection and intent to be present at the *Skelly* hearing.

At the *Skelly* hearing, Thompson presented an audiotape of the class session where Krista left during a discussion of the United States Supreme Court's hearing a same-sex marriage case.  In the audiotape, Thompson discussed the fact that the United States Supreme Court was discussing same-sex marriage and that Justice Alito had brought up a question during oral argument about what if four people wanted to get married.  One of the students brought up a situation in another country where three men had gotten married.  Thompson stated, "Wow.  Other thoughts?  Raymond?  Martin?  Krista, what do you think?  Does Alito have a point here or is he all washed up."

Krista responded that she thought marriage was by definition only between two people.  Thompson brought up a situation in which a woman had never met her biological father.  She searched him out when she was older, they liked each other and got married.

---

[6] The statement of charges were amended after the predisciplinary *Skelly* hearing. The charges will be detailed, *post.*

17

Thompson stated, "Now, these are consenting adults. They're also—they also meet the people's requirement of, oh, it should just be two people. What do you think about that, Krista? You have—by your definition, it should be just two people, you said." Krista responded that it was morally wrong. Thompson asked, "Are you judging, Krista?" She responded, "[A]bsolutely."

Krista then discussed that a person who was not married to their significant other would have no rights if that person was sick. A female student asked, "Well, it's not—okay. I'll—lesbians—well, girls, lesbians like a girl right, so she decides 'I don't want a guy because I like a girl.' " Thompson responded, "Okay." The female student continued, "Okay. If she likes a girl, why does—have you noticed every time there's a lesbian couple, two girls, why does one dress like a guy if she likes—and she likes girls, why doesn't she dress—" Krista interrupted, "That is so—I'm gonna—I'm sorry." The female student finished, "Why doesn't she dress like a girl? Why does she dress like a [boy]." Thompson then stated, "Maybe Krista will stay, because— " and Krista responded, "No, I'm not staying." Thompson then stated, "I'm going to say that that doesn't always happen, but you bring up a good point and it's worth considering." Krista stated that it was completely false and a generalization. Thompson stated, "My thing is I don't know why," and "Does anyone have a guess? I don't know."

Other students discussed the possible reasons.[7] Thompson suggested that the students ask their lesbian friends. Thompson then discussed polygamy. He stated, "But

---

[7] Krista had apparently left the class at this point.

my point is, if I had another wife, however, I could take one out on a date and the one would be home with the kids." A student brought up that the two wives would become jealous. Thompson agreed. He stated, "They get jealous. To such a degree that the whole atmosphere at times in the house might be characterized by this cloud—thick cloud of resentment between the two because one woman thinks that the husband loves her—the other woman more and the—women are already prone to being catty, aren't they? Aren't they? No? They are. Okay. Corrina agrees. She's smiling."

Thompson discussed the differences between marrying someone in your same culture or race and going outside such culture to marry someone. He told the class about a man who rode into a village and just grabbed the girl he wanted. Thompson asked, "Now, you got to admit, ladies, there's a part of every one of you, ladies, that kind of— kind of likes that a little bit, that a strong man would ride a—a strong, handsome man would ride into the village and pick you and take you. 'I want you for my (Inaudible).' That doesn't ring as kind of interesting at all?"

After the *Skelly* hearing, an amended statement of charges was filed in June 2017. It alleged the same four Education Code section 87732 violations. The amended statement of charges were as follows:

1.       In May 2015, Thompson singled out Krista in class causing her to be humiliated. This was during the discussion of same-sex marriage. Krista was a visible supporter of the LGBT community. Thompson admitted to an investigator he believed Krista was gay. She was treated differently in class.

19

2.      Thompson repeatedly stated in class that women who have children should not be out of the home despite having mothers in his class, including Angela.

3.      As a result of the above conduct, Thompson was given a 90-Day Notice. Thompson was on notice that such behavior was unprofessional. He was given directives to correct his conduct.

4.      Derian made a verbal complaint in June 2016 stating that the grade she received in Thompson's Sociology course was based on her sexual orientation. Derian also alleged that once Thompson became aware of her sexual orientation, he treated her differently. An investigation ensued.

5.      Thompson had been advised of the investigation. He was to refrain from discussing the matter with other students, faculty and members of the community. He was not to make any attempts at reprisals, to intimidate, coerce or threaten any participant in the complaint process. Thompson sent the email to Derian discussing the complaint and asking her to consider withdrawing it. After the email, Derian would not return Exton's calls.

6.      In an interview with Exton, Thompson said when he sent the email to Derian he was "unaware of the status" of Derian's complaint but it was clear he had received the letter about the pending investigation.

7.      On April 19, 2017, Thompson appeared at the *Skelly* hearing. During the hearing, Thompson stated the District threatened the security of his family. He also stated to Interim President of the College, Dr. Irving Hendrick, that the District had

20

"drawn a sword" and that he would also "draw a sword." Dr. Hendrick felt threatened by the statement. Dr. Hendrick reported the threat to authorities.

8. Thompson and his counsel produced at the *Skelly* hearing an audiotape of the lecture, which included the exchange between Krista and Thompson. In the audio, Thompson made a statement about polygamous marriage that women were prone to be "catty" and be jealous. Further, that every woman wanted a strong handsome man to ride into her village and pick her up. This audiotape showed Thompson's offensive conduct on the basis of gender/sexual identity in the classroom.

The District noted that a minimum qualification of faculty members at the College included sensitivity to and understanding of the diverse academic, socioeconomic and ethnic backgrounds of community college students. The District alleged, "Thompson has not shown any regret, understanding or appreciation of the harm his conduct has on the diverse community of students he and the District serve." The District sought Thompson's dismissal.

Thompson responded to the amended statement of charges again claiming academic freedom and the free exchange of ideas in the classroom. Further, Thompson's mention of drawing his sword was a metaphor for the fact he was going to seek a legal remedy if the claims against him were continued. It was not a threat. Further, the audiotape provided showed that he had not discriminated against Krista. He justified his statement that women are catty and that they wanted a strong man to pick them, by citing other research papers calling women catty.

21

Another *Skelly* hearing occurred on September 8, 2017. The District, after considering the two *Skelly* hearings, decided to recommend to the Board of Trustees that Thompson be terminated. The hearing would be conducted on October 17, 2017. The Board of Trustees voted to terminate Thompson on October 17, 2017. A statement of decision was filed. Thompson objected to the decision. The matter was sent to arbitration.

E.    ARBITRATION HEARING

The District filed an accusation against Thompson. It again stated the four sections under Evidence Code section 87732 for which they sought Thompson's dismissal: immoral conduct, dishonesty, evident unfitness for service, and persistent refusal to obey school laws. The District also cited the statement of charges as stated in the amended statement of charges filed with the Board of Trustees. The District alleged that Thompson's conduct had compromised his students' rights to learn. The College and District were committed to diversity and his actions did not support diversity. Thompson had not shown any regret or understanding of the harm of his conduct. Thompson filed a response.

The parties stipulated that the arbitrator was to determine whether (1) the District established cause for dismissal pursuant to Evidence Code section 87732, subdivisions (a), (b), (d) or (f); and (2) if the District established cause, the arbitrator shall determine the proper penalty. Further, the evidence was restricted to anything occurring after March 2013.

1.    *DISTRICT EVIDENCE*

At the hearing, which commenced on May 1, 2018, the District introduced excerpts of Thompson's deposition taken on April 12, 2018.  Thompson acknowledged that same-sex marriage was not specifically part of the curriculum for Sociology in May 2015, but he felt it was important to discuss because of the United States Supreme Court considering the issue.  He insisted he was unsure of Krista's sexual orientation.  He was aware that Krista was upset when she left his classroom during the discussion of same-sex marriage.  He felt the audio supported his position in that he followed the academic freedom policy, which allows for asking questions that may cause discomfort.  He insisted his "tone of voice" in questioning Krista showed he did not intend to be hostile toward her.[8]  Krista left the class before he had time to discuss the statement made by the student about lesbians dressing like men.

Thompson could not recall stating in class that women with children should stay at home.  He did admit he may have shared the pros and cons of a women working outside the home.  He became aware of Derian's complaint when he got a letter from the College.  He sent the email to Derian to show he cared and that he did not base her grade on her sexual orientation.  Thompson reached out to Derian because he did not want "another fake investigation carried out" like the one Lindoerfer did.

Thompson denied he threatened Hendrick at the *Skelly* hearing.  Thompson acknowledged that in the audiotape, while discussing polygamy, he agreed a woman may

---

[8]  The audiotape of the class has not been provided to this court on appeal.

23

get jealous in this type of marriage. He said that one student smiled when he called women catty, and did not remember any other reactions. He said some of his statements were a "gimmick" to make the concept stick. His claims were supported by the research.

He admitted he received the 90-Day Notice. When asked if he changed his conduct, he said, "There was nothing to change, so no."

Derian testified at the arbitration hearing. She transferred out of the College after Spring 2016 to another college to have a different experience. It was not because of Thompson. She confirmed that she made a complaint about Thompson. Thompson told her if she did the extra credit and got a certain test score, he would pass her. She described the extra credit as watching a film about "fixing being gay." She had newly been out as gay and it affected her emotionally. She disclosed in the writing she did for the assignment that she was gay. Thompson did provide another video about being born gay. She felt Thompson stopped making eye contact with her after the assignment. She never got a grade on the extra credit nor did she get the papers back.

Derian felt "terrible" after she got Thompson's letter although she did not read it until several months after he sent it. After the investigator called her, she no longer wanted to pursue the complaint. She knew Thompson was having another baby and she felt terrible.

Dr. Steinbeck testified she had been appointed the president of the College on July 1, 2017. She indicated the College was committed to diversity and inclusion in a safe learning environment. She served as the presiding officer at the second *Skelly* hearing involving Thompson. Steinbeck had reviewed both *Skelly* hearings, the Lindoerfer

24

investigation, the audiotape from class, and the Exton investigation. She determined after the second *Skelly* hearing that Thompson should be discharged. Dr. Steinbeck concluded that Thompson had "mocked" Krista in class based on the tone of his voice and the transcript. This was not appropriate teaching. Dr. Steinbeck did not think it was appropriate to teach that women should stay home with their children. It was a sexist comment. Further, calling women "catty" and jealous, and trying to get students to agree with him, was not appropriate in a Sociology class. His statement about women wanting to be kidnapped by a strong man was also sexist. These comments could alienate students and went against the policy of the College to be inclusive. Students had expressed that they were not participating in Thompson's class if they had a different view. She found the email to Derian to be egregious because it interfered with the complaint process.

Daniel Casella was a marriage and family therapist employed by the District to provide crisis therapy to students at the College. He had not treated any of the students involved in the case. He was designated an expert in mental health. In his experience, a student subjected to derogatory or degrading comments based on their gender could cause the individual to experience anxiety, depression, difficulty concentrating and poor self-esteem. Even a student who was not targeted with the comments would be concerned he or she would become a target. If the person making the comments was a faculty member, the student may be concerned about his or her grade. He stated that subjecting a minor to conversion therapy in California was illegal. The American Psychological Association

had a policy that a psychotherapist was not to attempt to coerce a person to change their gender identity.

Angela also testified at the hearing. She was currently attending Loma Linda University. While Angela attended the College, she had children at home. She took two of Thompson's classes. She was concerned in his classes that he would grade her differently if she expressed viewpoints different than those held by him. She confirmed he told the class that women should be at home with their children. She was offended by the comment. She felt guilty and degraded. Thompson expressed his views in a persuasive manner. Angela was aware that Victor had submitted a paper to Thompson that opposed Thompson's view and he got a lower grade than she had in agreeing with Thompson. Thompson stated that a patriarchal family was better than a single mother family. Angela and others discussed the video during a Diversity Committee meeting. She observed students visibly upset after viewing the video.

Hendrick was the interim President of the College between 2016 and 2017. Hendrick was the presiding officer for Thompson's first *Skelly* hearing. Thompson threatened Hendrick by looking directly in his eyes and telling him that he had raised his sword against him and that if he and his family were harmed, he would raise his sword against Hendrick. Even if it was a metaphor, it was a threat of violence in Hendrick's opinion. Hendrick reported the exchange to the on-campus police who assured him that Thompson could not come on campus. Hendrick believed that Thompson should be discharged based on the charges. Hendrick did not see the statement by Thompson as a threat of legal action.

Krista was also called as a witness. She graduated from the College with an associate's degree. She confirmed that she received an A in Thompson's class. Thompson said in class that his wife was not educated and stayed at home and he liked it that way. He also stated that if he only had two children, a boy and a girl, he would send the boy to college because it was more "normal" for the girl to stay home and take care of the children. She heard him call women "catty" and gold-diggers.

She was present in class when someone asked why "dykes" are so ugly and he pondered the question, and repeated it. She found it offensive that he used the word. She oftentimes wanted to leave class because of Thompson's statements. Thompson never showed gay families in a positive light. Thompson was not sensitive to the diversity in the classroom. During the discussion of the California Supreme Court case, he never discussed the pro same-sex arguments. She absolutely felt he targeted her during the discussion. She walked out because she was disgusted by Thompson's statements comparing same-sex marriage to an incestuous relationship. She cried for over 30 minutes after she left class.

Thompson made derogatory comments about women at least once each week. In all of her other college classes she had taken, she never had a professor make derogatory comments about women. She did not drop the course because she needed the grade in the class. Krista was upset that Thompson never reached out to her after she walked out of his class.

Exton also testified. She tried to meet with Derian but Derian initially did not respond to her. When she finally spoke with Derian, which was prior to the email being

27

sent by Thompson, she told Exton she had moved on and did not want to talk about the complaint. After the email, she tried to contact Derian again but received no response. Exton thought the email to Derian was particularly egregious because it was a professor to a student. Exton felt the letter to Derian was clearly an attempt to influence and coerce Derian into dropping her complaint.

Larisa Broyles was a professor at the College. She explained that MV-ALL LISTSERV was an email system that sent messages to the entire faculty at the College. It was mainly for announcements of upcoming events and not a discussion section. The video sent by Thompson in 2014 stated in the subject line "The Research Continues." There was a heated debate on the email. Thompson defended himself stating that he had a right to send it out and that people should look at it.

In 2015, Broyles encountered Charles on campus. He was sitting outside with his head down and seemed upset. He explained that Thompson had been discussing homosexuality in class and he asked any of them if they felt bad about themselves or feeling deviant. Charles felt forced to raise his hand. Charles felt like a deviant after the discussion. Charles asked Broyles if there was something wrong with him. Charles wanted to drop the class but felt he had to finish.

Broyles also spoke with Angela during a Diversity Committee meeting. Angela told her she had gone to Thompson and said she had to be absent because of a family matter. Thompson responded that " 'This is why women shouldn't be in the classroom' " and " 'should be at home taking care of their family.' "

Charles appeared at the arbitration hearing. He had graduated high school in 1972 and came back to the College in 2011. He took Thompson's Sociology class in 2014. He was part of the LGBT community. He heard Thompson make derogatory comments toward women in class at least once each week, stating that a woman's place was in the home doing domestic chores. He was in class when Thompson showed the video. Several students left the class. Charles was very offended by the movie and felt it changed his relationship with Thompson. The movie described being homosexual as an illness that could be cured.

After the video, a student asked Thompson if the College was aware he was showing the video. Thompson responded that he had tenure and could do whatever he felt like in class. This scared Charles because he wore earrings and scarfs to class. Thompson stated to the class if a person felt like they had these "symptoms" of homosexuality that it was an option to cure the "illness." Charles did not speak up in class after that day because he was afraid Thompson would fail him. He received a C in Thompson's class. He was surprised because he got As and Bs in most of his classes. He also had received As and Bs on all his papers he turned in to Thompson. He did not speak with an investigator in 2015 because he wanted to just move on and forget about it.

Lorraine Jones was the compliance officer for the District. She was responsible for managing the District's responses to unlawful discrimination or harassment claims. Jones explained that the District would be subjected to penalties if it did not comply with Title IX, which is a federal law that no person on the basis of their sex can be denied admission or benefit in any program that receives federal assistance. The District could

29

be sued for violating Title IX. The District also each year advised faculty of their nondiscrimination policy. All gender discrimination complaints were taken seriously.

Jones received notice of a complaint against Thompson by Derian; Thompson was sent a letter advising him that the complaint was being investigated. Jones tried contacting Derian on two occasions but she was unable to talk to her. Jones reviewed the email sent by Thompson to Derian. She interpreted the email to be a request for Derian to withdraw her complaint.

Jeff Rhyne was a professor who taught English at the College. He watched the video. He sent a message to all faculty that he disapproved of the video. He thought the video was dangerous because it made homosexual people feel inadequate or inappropriate.

Sergio provided testimony at the arbitration hearing. He had transferred to a four-year college and was studying psychology. He had been at the College between 2011 and 2015. When Sergio first started college, he was very close-minded. He had become more inclusive while at college. He confirmed a diagram that Thompson had presented to the class which put god first, then man and then women. Sergio indicated that students did not complain about Thompson because he was an easy grader.

Pfeifle testified at the arbitration hearing that Krista came to her three times with complaints about Thompson. Pfeifle recommended that she speak up in class but Krista was afraid it would lower her grade. The third time she came to Pfeifle she was shaking and crying. She said that during a discussion of gay marriage, Thompson called her out

in class because she was part of the LGBTSA. When a student used the word "dyke" he did not stop her.

Faith testified in front of the arbitrator. She took Sociology from Thompson in Spring 2016. Thompson oftentimes made offensive statements about gender and sexual orientation in class. He stated that women belong at home and should be subject to men. He spoke about feminists in a derogatory manner. He said the world starting falling apart when women got birth control. It destroyed morality. Even though Thompson claimed his statements were based on studies, she tried to look up the studies and could not find support for his statements. He also said that "the gays" were ruining the moral fabric of society. He called them deviant and that they should not be raising children.

Thompson offered extra credit to watch the video. He told the class not to tell anyone he was offering the video as extra credit. Every day Faith was subjected to an offensive comment by Thompson. She felt she could not drop the class. She needed the credits. She also feared retaliation. She got an A in the class. She felt he treated those in his class who appeared to be homosexual different.

Victor testified he was upset that Thompson said that professional women were not good mothers; housewives were better. Women were supposed to stay home and take care of their children and husband. Victor walked out of class when Thompson said that homosexuality was an abominable sin. He walked out during a discussion on conversion therapy. Thompson's comments on homosexuality and women were constant in the class.

31

## 2. *THOMPSON'S EVIDENCE*

Thompson testified that in regards to Krista, they were talking about marriage and family in general including same-sex marriage and polygamy. They were typical topics in a Sociology class. He asked several students questions in the recorded class. He only asked Krista four questions. Krista mentioned that marriage was between two people so he followed up with questions about four people getting married, or a father and an estranged daughter. Thompson believed that Krista left class because of the students comment about one of the persons in a lesbian relationship dressing like a man. He felt he tried to ameliorate the situation but Krista left. He denied he treated Krista differently in class. He called on several students in class that day. He admitted he never told the students to not use stereotypes in referring to gay couples.

He did not believe that women who had children should stay at home. He did assign an article about not marrying a career woman. He insisted it was based on data and was not his bias. He assigned another article about not marrying a lazy man. Thompson liked to use provocative material to get the attention of his students. He admitted that stating a woman should stay in the home would be sexist.

He received the 90-Day Notice in March 2016. He received the notice despite the complaints by Krista, Angela, Victor and Sergio all being found to not violate District policy. Thompson felt he was being punished for his views. There were no specifics in the 90-Day Notice as to what he was supposed to do to correct his behavior. Thompson believed that academic freedom meant that students would sometimes by offended.

Thompson showed the video in all his classes in Fall 2014. He agreed not to show it for one semester. He kept it as extra credit because he did not agree to never show it. He claimed he never saw anyone cry about the video and denied that half of his class walked out when he showed it.

The letter sent to Thompson about the investigation into Derian's complaint contained directives that he was not to retaliate, intimidate the complainant and not to persuade other students or faculty involved in the investigation. It did not state he could not contact Derian. He just wanted to reach out to Derian to explain he had not discriminated against her. He was not trying to bribe her to dismiss the complaint. When he used the word "status" in speaking with Exton, he meant Derian's sexual orientation. He thought he may have not returned Derian's extra credit paper because she was often missing from class.

Thompson denied that he threatened Hendrick. The use of the word "sword" was a metaphor for a legal remedy. When talking about women wanting a strong man, he was talking about the Hmong culture and was only using a "playful tone" when asking the women in the class if they would like that. He also used the word "catty" in a playful tone. He insisted that "catty" was used in research.

Thompson was evaluated by faculty and students every three years. His last evaluation was Spring 2015. His last reviews were very favorable. Thompson admitted that he was notified when a faculty member would be in his class evaluating him. Thompson felt it was impossible to teach Sociology without hurting the feelings of any student. Academic freedom contemplated students being offended.

The parties both submitted briefs after the arbitration hearing. Thompson argued that his right to academic freedom and First Amendment rights were being infringed. The District argued that Thompson should be dismissed because he targeted, harassed and discriminated against students based on their gender, sexual expression and orientation. He targeted students who were gay, and women, especially mothers.

F.      ARBITRATION RULING

The arbitrator issued a written ruling. The arbitrator listed the exhibits that had been introduced. The arbitrator then summarized the evidence that included the testimony and investigations from Derian, Dr. Steinbeck, Dr. Casella, Angela, Hendrick, Krista, Exton, Broyles, Charles, Jones, Rhyne, Sergio, Pfeifle, Faith, Victor, and Thompson.

As for the first allegation the arbitrator concluded, "After a review of the documents introduced and testimony presented, what Thompson said and allowed to be said by others could well have caused Krista E. to become upset, but did not violate any of the College's policies or procedure and/or rise to the level of unprofessional conduct." The audio did not corroborate Krista's testimony. She was not singled out as she claimed. The offending statement about lesbians was made by another student. Thompson could not ameliorate the situation because she left. The discussion about same-sex marriage was appropriate in a Sociology class. The arbitrator noted it was difficult to balance academic freedom against discrimination and harassment. The arbitrator expressed it was difficult to understand that, if Thompson was targeting students for harassment and discrimination, and making inappropriate comments, that

34

none of this was put on his student evaluations. A majority of the student evaluations were positive. Further, he had very positive faculty reviews.

As for Thompson's comments about women staying home with their children, the arbitrator found it was supported by the testimony of several students and Thompson admitted he presented studies on working women and marriage. He also made comments to Dr. Steinbeck. The arbitrator found, "Such comments about women had a negative effect on his students and were contrary to established College policies which prohibited discrimination and harassment." The arbitrator further stated, "Having a faculty member actively discourage such participation under the guise of instruction, was prejudicial and contrary to the mission of the College. An academic institution should not have to tolerate such behavior at the expense of its students."

As for the 90-Day Notice, Thompson was given no assistance by the District to change his behavior. Nonetheless, "the weight of the evidence clearly established, he engaged in additional unprofessional conduct after receiving the notice with the letter sent to Derian H. and his false statement to the investigator."

The arbitrator concluded there was no evidence that Derian's grade or the failure to return her extra credit papers was due to her sexual orientation. The arbitrator did find that Thompson violated the directive of the letter sent to him regarding the investigation into Derian's complaint. As such, the arbitrator found, "Even though the evidence was insufficient to prove he had discriminated or retaliated against Derian H. in grading, his denial that he was not trying to threaten or coerce her when he wrote his letter was unpersuasive." An attempt to influence was enough. The arbitrator felt the evidence was

sufficient that he lied to Exton when he said he did not know the "status" of Derian's complaint. The arbitrator found that Thompson did not threaten Hendrick.

The arbitrator found that Thompson's comments on the audiotape about being "catty" were inappropriate and a derogatory statement. Such improper characterizations and name calling was unacceptable. These statements on the audiotape showed Thompson was gender biased. The arbitrator concluded, "The evidence was sufficiently supportive in that regard."

The arbitrator found there was not sufficient evidence that students were discouraged from presenting different viewpoints.

As for evidence that Thompson targeted students, the arbitrator concluded, "There is little doubt Thompson had strong opinions in certain areas, however, with the exception of the clearly inappropriate comments he made about women attending college or working, there was insufficient evidence he actually 'targeted' individuals based on gender, religion, or another protected class."

The arbitrator then addressed the appropriateness of dismissal. The arbitrator noted that several events occurred prior to the issuance of the 90-Day Notice but the president chose not to discharge or take any other disciplinary action based on the events prior to the notice. The arbitrator concluded, "It was his latter conduct, which although still only sustained in part, warranted some type of severe discipline." The arbitrator also found as an aggravating factor that there was a lack of remorse or acceptance of responsibility by Thompson. The arbitrator noted "He exhibited a certain amount of arrogance when he told his students that tenure gave him the right to do what he wanted."

36

The arbitrator also noted, "Even though the 90-day letter clearly put Thompson on notice certain conduct would not be tolerated, he still chose to ignore the directive."

The arbitrator then issued his finding of facts, which, pertinent here, included (1) Thompson did not cause Krista to be humiliated based on her affiliation with the LGBT community; (2) Thompson made derogatory statements toward women and continued through Spring 2016; (3) Thompson failed to adhere to the requirements of his 90-Day Notice when he made discriminatory statements on the basis of gender; (4) he did not discriminate against Derian; (5) Thompson failed to adhere to the directives in Exton's letter of September 14, 2016, when he interfered with an investigation by improperly contacting Derian in attempt to get her to drop her complaint, and made a false statement; (6) Thompson did not threaten Hendrick; (7) the audiotape of his class did not show gender bias;[9] (8) Thompson did not discourage students from presenting different points of view in class; (9) Thompson did not target students based on gender, gender identity or religion; (10) there was sufficient cause to suspend Thompson by a preponderance of the evidence because of immoral conduct, dishonesty, unfit for service and refusal to obey school laws; (11) the *Morrison*[10] factors of unfitness to teach were shown; and (12) given that not all of the allegations were sustained and because of the presence of mitigating circumstances, the discharge was not appropriate. The arbitrator imposed a 90-day suspension without pay but not discharge.

---

[9] This clearly was not the intent of the arbitrator. The arbitrator had already concluded that there was sufficient evidence of gender bias in the tape.

[10] *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*).

G.      PETITION FOR WRIT OF MANDATE

The District filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5 (petition).  The District contended that the arbitrator's decision to suspend Thompson and reinstate him was not supported by the weight of the evidence and constituted a prejudicial abuse of discretion.  The finding was inconsistent with the factual findings.  The District alleged some of the factual findings by the arbitrator were incorrect, but did not specifically argue the factual findings.  The District sought dismissal of the arbitrator's decision and for the trial court to order the arbitrator to enter a new decision upholding the dismissal of Thompson.

Thompson, as the real party in interest, filed an answer to the petition arguing that the petition should be denied.

The District filed its opening brief in support of the petition.  The District argued that the arbitrator's decision was erroneous as it orders the reinstatement of a professor who was found unfit to teach, engaged in immoral conduct, was dishonest and disobeyed school laws.  The finding that he was unfit to teach itself was enough to warrant Thompson's dismissal.  The District was concerned reinstating Thompson would subject them to liability and that students would be further victimized.  The District insisted that *Morrison* mandated dismissal.  The District contended the arbitrator abused its discretion by discrediting the accounts of multiple students regarding discrimination based on being part of the LGBT community.  However, the District did not argue which of the statement of charges should have been found true.  Further, the arbitrator improperly credited student evaluations, which were hearsay as Thompson did not call these students

38

to testify. The District concluded that a community college district could not under any circumstances be required to retain a faculty member who was found unfit to teach.

Thompson filed a responding brief. Thompson argued that the trial court had to afford a strong presumption of correctness to the arbitrator's findings. Further, it was the arbitrator's decision as to the appropriate penalty to be imposed. Although the arbitrator found there was sufficient cause for disciplinary action, it did warrant terminating Thompson. The evidence supported only a 90-Day suspension.

The District filed a reply to Thompson's brief. The District again argued that the finding that Thompson was unfit to teach required his dismissal.

The hearing on the petition was held on July 9, 2019 after the trial court issued its tentative ruling that it was going to deny the petition. The District requested a written statement of decision. The trial court first noted that it did not read Code of Civil Procedure section 632 as requiring a written statement of decision if the hearing was less than eight hours. The trial court ruled it did not have to issue a written statement of decision as the matter was only going to take approximately 20 minutes.

Counsel for the District argued they were "really challenging" the fact that after finding Thompson unfit for teaching, which meant he had a defective temperament that could not be corrected, it was inconsistent under the Education Code to reinstate him. The District noted, "In reaching that determination, he made findings of fact, and we agreed."

The trial court first noted that it could find no case law to support that once a determination of unfitness was found it meant automatic dismissal. It was within the

discretion of the arbitrator.  Counsel for the District responded that a finding of unfitness meant a defective temperament as a matter of law that cannot be corrected.  Further, every case in which a teacher was found unfit, they were terminated.  The District argued the arbitrator abused his discretion.  The District contended that Thompson had not apologized and continually engaged in the conduct.  He had defective temperament that could not be changed.  He would continue to behave this way and the District would be liable.  Thompson argued that the arbitrator never found he had defective temperament.  The trial court adopted the tentative ruling and denied the petition.

Judgment adopting the tentative ruling and denying the petition was entered on August 9, 2019.

## DISCUSSION[11]

The District essentially argues on appeal that the arbitrator and trial court erred by finding that some of the charges were not supported by the evidence; and by finding that Thompson should only be suspended for 90 days rather than be dismissed.

---

[11] The College did not reinstate Thompson after the denial of the petition despite the 90-day suspension period having long since passed.  The parties were asked, on this court's own motion, to provide supplemental briefing on whether the appeal should be dismissed based on the disentitlement doctrine.  " ' "A trial court's judgment and orders, all of them, are presumptively valid and must be obeyed and enforced.  [Citation.]" ' [Citation.]  [¶]  'An appellate court has the inherent power, under the "disentitlement doctrine," to dismiss an appeal by a party that refuses to comply with a lower court order." (*Blumberg v. Minthorne* (2015) 233 Cal.App.4th 1384, 1390.)  "Appellate disentitlement is a *discretionary* doctrine that must be applied in a manner that takes into account the equities of the individual case." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 901, italics added.)  After consideration of the supplemental briefing, we do not exercise our discretion to impose the doctrine.

## A. STANDARD OF REVIEW

"When a school district seeks to dismiss a permanent employee, . . . , for immoral conduct or evident unfitness for service, the [school district] must hold a hearing to determine whether the charged conduct occurred and, if it did, what the proper remedy should be." (*Crawford v. Commission on Professional Competence of Jurupa Unified School Dist.* (2020) 53 Cal.App.5th 327, 336 (*Crawford*).) "The governing board of a community college district may seek the dismissal of a regular (tenured) employee for one of ten specific causes" pursuant to Education Code section 87732. (*West Valley-Mission Community College District v. Concepcion* (1993) 16 Cal.App.4th 1766, 1773 (*West Valley*).)

Education Code section 87732 provides, pertinent to this appeal that, "No regular employee or academic employee shall be dismissed except for one or more of the following causes:  [¶]  (a) Immoral or unprofessional conduct.  [¶]  (b) Dishonesty. [¶] . . . [¶]  (d) Evident unfitness for service.  [¶] . . . [¶]  (f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her."

Education Code section 87667 provides "A contract or regular employee may be dismissed or penalized for one or more of the grounds set forth in Section 87732."  The disciplinary proceeding is heard by an arbitrator who "shall determine" whether there is cause, and if so, the precise penalty to be imposed. (Educ. Code, § 87675.)  Here, the arbitrator found that the District had proved Education Code section 87732, subdivisions

41

(a), (b), (d) and (f), and "penalized" Thompson by imposing a 90-day suspension without pay. The District appealed by filing its petition.

"Code of Civil Procedure section 1094.5 provides a trial court reviewing the decision of an administrative agency exercises its independent judgment in reviewing the evidence and that an 'abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.' [Citation.] Under the independent review standard, the trial court may weigh the credibility of witnesses." (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461 (*San Diego*).) " 'In a proceeding on a writ of administrative mandate, "the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." [Citation.]' [Citation.] 'Though the trial court is required to exercise its independent judgment on the evidence, it is to give a 'strong presumption of correctness' to the [arbitrator]'s findings.' " (*Crawford*, *supra*, 53 Cal.App.5th at p. 336.)

" 'After the superior court makes an independent judgment upon the record of an administrative proceeding, [the] scope of review on appeal is limited.' [Citation.] We must sustain the trial court's findings if they are supported by substantial evidence. [Citation.] In reviewing the evidence, we resolve all conflicts in favor of the party prevailing at the trial court level and must give that party the benefit of every reasonable inference in support of the judgment. ' " 'When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court.' " ' " (*San Diego*, *supra*, 194 Cal.App.4th at p. 1461.) We

will discuss the standard of review for the penalty imposed by an arbitrator and affirmed by the trial court, *post.*

We first note that the District argues the trial court erred by refusing to issue a statement of decision. The trial court was required to issue such a decision. (*Giuffre v. Sparks* (1999) 76 Cal.App.4th 1322, 1326, fn. 3 [a hearing on a petition for writ of mandamus is a trial of a question of fact requiring a statement of decision].) Such error does not require automatic reversal. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.) We conclude, *post*, that the arbitrator, and the trial court, by denying the petition, abused their discretion in imposing a 90-day suspension instead of a dismissal. As such, the District cannot show prejudice for the trial court's decision not to issue a statement of decision either orally or in writing.

B.     FINDINGS ON STATEMENT OF CHARGES

The District makes specific arguments on appeal that the trial court and the arbitrator findings on the unsustained charges were not supported by substantial evidence. This includes the findings that the audiotape of the class lecture was not evidence of gender bias;[12] the finding that Thompson did not discourage students from presenting views different than his own; by not finding that Thompson targeted students based on protected status; finding that Thompson did not cause Krista to be humiliated based on her affiliation with the LGBT community; finding that Thompson did not treat Derian inequitably based on her sexual orientation; and that Thompson did not make a physical

---

**12** We have already concluded that the arbitrator did find the audiotape showed some gender bias.

43

threat to Hendrick. The District further contends the trial court and the arbitrator erred by finding that allegations prior to the issuance of the 90-Day Notice could not form the basis of the discipline.

Despite the arbitrator not finding all of the charges true, and essentially relying on the evidence after the 90-Day Notice, he still found that Thompson was subject to dismissal pursuant to Education Code section 87732. Further, the arbitrator found all of the *Morrison* factors true finding that Thompson was unfit to teach. The charges that the arbitrator found true, and the trial court affirmed by denying the petition, combined with the lack of any evidence to suggest Thompson's behavior would change, are sufficient to support that Thompson should have been dismissed rather than suspended.[13]

C.     DISMISSAL

The District contends the trial court and arbitrator abused their discretion by finding that Thompson should not be dismissed. It contends the arbitrator and the trial court failed to consider the District's potential liability from Thompson's conduct. Further, by finding that Thompson was unfit to teach, as evidenced by finding all of the *Morrison* factors were supported by the evidence, he could not be employed by the District. *Morrison* mandated his dismissal. Further, his immoral conduct, dishonesty and failure to obey school laws also warranted his dismissal.

---

[13] We also note that the District did not raise any specific arguments in the briefing on the petition about the findings of fact. The District stated at oral argument that it agreed with the findings. The failure to raise an issue in a petition for writ of mandate waives the issue on appeal. (*Crawford*, *supra*, 53 Cal.App.5th at p. 343.) This is an additional reason that the findings of fact by the arbitrator and affirmed by the trial court need not be addressed on appeal.

44

"The California Supreme Court has interpreted the statutes involving discharge of teachers for the listed causes. Terms such as immoral conduct, unprofessional conduct, or moral turpitude, are so general that they must be given meaning by relation to the particular profession involved. [Citation.] In other words, a teacher may have committed an immoral act, but unless it indicates his unfitness to teach, it is not an appropriate basis for discharge." (*West Valley*, *supra*, 16 Cal.App.4th at pp. 1774-1775.)

In determining whether an individual is unfit to teach, the following factors may be considered: "[T]he likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Morrison*, *supra*, 1 Cal.3d at pp. 229-230, fns. omitted.) "These factors are relevant to the extent that they assist the board in determining whether the teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the [school district's] standards." (*Ibid*.)

Here, the arbitrator found all of the *Morrison* factors had been met. The District insists this mandated dismissal of Thompson. However, there is no statutory or case law to support such claim. It appears, from both the cases and the language of Education

45

Code section 87667, that even if the arbitrator finds each of the *Morrison* factors are evident, he still has the discretion to impose discipline short of a dismissal.

" ' "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. . . . Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." [Citations.]' '[I]n a mandamus proceeding, an appellate court vis-a-vis the trial court, conducts a de novo review concerning possible abuse of discretion by the administrative agency. [Citation.] The trial court's determination of abuse or nonabuse of discretion by the administrative agency is of no concern to the appellate court. The appellate court gives no deference to the trial court's determination. It makes its own determination, de novo. [¶] Conversely, . . . in a mandamus proceeding an appellate court vis-a-vis *the administrative agency*, does not independently or "de novo" determine penalty. "[A] court cannot substitute its discretion for that of the administrative agency on the degree of punishment to be imposed." ' " (*Pollak v. State Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404; *Cate v. State Personnel Board* (2012) 204 Cal.App.4th 270, 284.)

However, "[W]hile the administrative body has a broad discretion in respect to the imposition of a penalty or discipline, 'it does not have absolute and unlimited power. It is bound to exercise legal discretion, which is, in the circumstances, judicial discretion.' [Citation.] In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the

public service.' [Citation.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly*, *supra*, 15 Cal.3d at pp. 217-218.)

In *West Valley*, *supra*, 16 Cal.App.4th 1766, Winston H. Miller, a community college teacher, was arrested and charged with selling cocaine. The college district began proceedings for dismissal pursuant to Education Code section 87732. Miller was acquitted of the criminal charges because the cocaine found was excluded from evidence but it was admitted at the administrative hearing on his dismissal. (*West Valley*, at pp. 1770, 1773.) The arbitrator determined that Miller was guilty of immoral conduct, but was not unfit to teach. The arbitrator imposed a one-year suspension without pay. (*Ibid.*) The college district filed a petition for writ of mandate. The trial court issued a writ directing the arbitrator to order Miller's dismissal and no back pay. Miller appealed contending, among other things, that the trial court abused its discretion in making its own penalty determination and by finding he was unfit to teach. (*Ibid.*)

On appeal, the appellate court reviewed whether the trial court properly determined that the *Morrison* factors were supported by the evidence, which rendered Miller unfit to teach. (*West Valley*, *supra*, 16 Cal.App.4th at p. 1776.) The appellate court found, "The superior court's findings were sufficient to support its ultimate finding of unfitness to teach." (*Id.* at p. 1778.)

The appellate court then addressed whether the trial court properly determined the appropriate remedy was dismissal, rather than a one-year suspension. The court noted that, "Review of the penalty determination . . . traditionally differs from the review of the

47

evidence and factual findings. The superior court upholds the penalty determination of the agency or arbitrator, unless there has been a manifest abuse of discretion. [Citations.] The appellate court uses the same standard as the superior court, reviewing the arbitrator's penalty for manifest abuse of discretion." (*West Valley*, *supra*, 16 Cal.App.4th at pp. 1778-1779.)

The appellate court in *West Valley* referred to *County of Santa Clara v. Willis* (1986) 179 Cal.App.3d 1240. It summarized *Willis*: "[A] homosexual hospital attendant was accused of making inappropriate sexual advances to paralyzed patients and also to other hospital employees, of being insensitive to patients' needs, and of failing to do his job properly. After administrative proceedings the hospital board determined he had engaged in gross misconduct, but reinstated him without backpay. [Citation.] The superior court granted a peremptory writ of mandate, finding the board had abused its discretion and ordering it to terminate the employee. [Citation.] [¶] This court affirmed the trial court's order granting the petition for a writ, based on the singular circumstances of the case. [Citation.] We agreed with the superior court that the hospital board had abused its discretion in reinstating Willis. [Citation.] While an administrative body has broad discretion in determining an appropriate penalty, it does not have absolute and unlimited power, but must exercise judicial discretion. We affirmed the trial court's ruling ordering the discharge of the employee." (*West Valley*, *supra*, 16 Cal.App.4th at p. 1779.)

The *West Valley* court concluded that, like *Willis*, the penalty imposed by the trial court was correct. It found, "The arbitrator abused his discretion in selecting the penalty

48

of one year's suspension.  The idea of a cocaine-dealing community college instructor communicating moral standards to students is just as repugnant as a hospital aide fondling the genitals of helpless patients with spinal cord injuries.  Reasonable minds cannot differ that entrusting impressionable young minds to a teacher who facilitated the sale of a kilo of cocaine would be dangerous.  Reasonable minds cannot differ on the propriety of discharge as a penalty for engaging in this immoral conduct.  Under the unique circumstances of this case the superior court did not err in determining the appropriate penalty." (*West Valley*, *supra*, 16 Cal.App.4th at p. 1779.)

In *San Diego*, *supra*, 194 Cal.App.4th at p. 1457,[14] the employee, Frank Lampedusa, was the dean of students at a middle school.  The principal stated that Lampedusa did a good job and was being considered for a vice principal position.  An anonymous call was made to the school district that Lampedusa had an advertisement on Craigslist " 'men seeking men' Web page soliciting sex."  The advertisement described in detail the sexual acts Lampedusa wanted to engage in and included photographs of his face, anus and genitalia.  The advertisement did not list his name or profession.  (*Id.* at pp. 1458-1459.)  The school district advised Lampedusa to remove the advertisement and he immediately removed it.  Lampedusa continued to work for one more month and then was placed on administrative leave.  He was then served with a notice of dismissal.  (*Id.* at p. 1459.)  At a hearing in front of the Commission on Professional Competence

---

[14] In *San Diego*, the teacher was dismissed pursuant to Evidence Code section 44932, which contains similar categories, including evident unfitness for service, as reasons for dismissal.

(Commission), Lampedusa testified he did not intend the advertisement to be seen by students. The Commission affirmed no student had seen the advertisement. It concluded that although the advertisement was vulgar and inappropriate, there was no connection with him being a dean of students at the middle school. It found the school district failed to show Lampedusa was unfit to teach by a reason of temperamental defect and that he did not engage in immoral conduct such that he was unfit to teach. Further, there was no likelihood of reoccurrence. (*Id.* at p. 1460.) The school district filed a petition for writ of mandate. The trial court adopted the Commission's findings and the school district appealed. (*Id.* at p. 1461.)

On appeal, the appellate court reviewed the *Morrison* factors and found the Commission had improperly rejected them. The court noted, " ' " '[T]he calling [of a teacher] is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous that they are incapable of enumeration in any legislative enactment. . . . His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention.' " [Citation.] [¶] There are certain professions which impose upon persons attracted to them, responsibilities and limitations on freedom of action which do not exist in regard to other callings. Public officials such as judges, policemen and schoolteachers fall into such a category. [¶] . . . "A teacher . . . in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the [students] coming under [his] care and protection." ' " (*San Diego*, *supra*, 194 Cal.App.4th at pp. 1463-1464.) The

50

court noted that Lampedusa, during his testimony, had stated that he previously posted these advertisements and placed the onus on the parents and students to not access his site. (*Id.* at p. 1464.) The appellate court found also that the Commission erred by finding that Lampedusa would not commit such acts again, as he had admitted to posting the advertisement several times before. Further, he did not believe he had done anything immoral. Finally, his posting of this sexually explicit content showed a serious lack of judgment. (*Id.* at p. 1465.)

The appellate court in *San Diego* concluded that "The nexus between Lampedusa's conduct and his fitness to teach has been established. It is evident that his conduct was 'detrimental to the mission and functions of [his] employer.' [Citation.] . . . The conduct itself, together with Lampedusa's failure to accept responsibility or recognize the seriousness of his misconduct given his position as a teacher and role model, demonstrates evident unfitness to teach." (*San Diego*, *supra*, 194 Cal.App.4th at p. 1465.) The appellate court also found that he engaged in immoral conduct. The appellate court concluded that "Lampedusa's conduct constituted grounds for dismissal based upon his evident unfitness to teach and his immoral conduct." (*Id.* at p. 1467.)

Similarly, in *Cate v. State Personnel Board*, *supra*, 204 Cal.App.4th 270, the California Department of Corrections and Rehabilitation filed a petition for writ of administrative mandamus challenging an administrative law judge's (ALJ) decision to impose a 30-day suspension rather than termination of a correctional officer whose actions at the California Institute for Women were found to be inexcusable neglect of duty, dishonest, he engaged in discourteous treatment of inmates and that he lied to his

supervisor.  The trial court reversed the decision of the ALJ finding an abuse of discretion in imposing a suspension rather than termination.  (*Id.* at pp. 279-280.)  The correctional officer sought review, and the appellate court affirmed the judgment of the trial court finding that the ALJ found that the correctional officer's misconduct may be repeated "and that such misconduct would likely result in harm to the public service . . . the 'overriding' consideration in the determination of penalty is the potential for harm to the public service." (*Id.* at p. 285.)

In *Kolender v. San Diego County Civil Service Commission* (2005) 132 Cal.App.4th 716, a deputy sheriff was dismissed by the sheriff's department because he lied about another deputy's physical abuse of an inmate.  The sheriff's deputy appealed to the San Diego Civil Service Commission, which reduced his penalty to a 90-day suspension.  (*Id.* at pp. 718, 720.)  After the trial court denied the sheriff department's petition for writ of mandamus disputing the penalty determination, on appeal, the court held that such reduction was an abuse of discretion.  The court explained:  " 'An abuse of discretion occurs where, as here, the administrative decision manifests an indifference to public safety and welfare.  "In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated, is likely to result in, '[h]arm to the public service.' [Citations.]  Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." [Citation.]  The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.'

52

[Citation.] Accordingly, this is not a case where reasonable minds can differ with regard to the appropriate disciplinary action." (*Id.* at p. 721.)

Here, Thompson's conduct in the classroom, which significantly impacted his students, coupled with the evidence that he had no remorse or plans to change his behavior, renders the decision to impose just a 90-day suspension a manifest abuse of discretion in this case. Putting Thompson back in the classroom provided no protection to his students. Both *Kolender* and *Cate* emphasize the harm to the public service by repeated bad behavior. In *San Diego*, the appellate court put great weight on the fact of reoccurrence and that Lampedusa accepted no responsibility for his actions. Similarly, here, Thompson took no responsibility for his actions, despite students testifying at the arbitration hearing that they were upset and even cried during their testimony. Thompson expressed he felt his tenure and right to academic freedom allowed him to discuss controversial subjects even if it upset students. He felt his academic freedom allowed him to offend his students.[15] Thompson said he had no reason to change after the 90-Day

---

[15] The dissent appropriately recognizes that the First Amendment protects public community college professors from discipline "based on student offense alone." (Dissent at p. 6, fn. 3.) At a general level, Thompson was correct that his academic freedom gave him broad latitude to challenge and even upset students. As this case comes to us, however, it does not present such an issue of academic freedom. By the time of the arbitration hearing, both sides "agreed such instructional latitude was not unlimited" and subject to a "balancing test" under *Pickering v. Board of Education* (1968) 361 U.S. 563. Considering those legal positions, the arbitrator found that there is a difference between presenting challenging ideas and "targeting students to such a level to harass, threaten, ridicule, or impose one's views." Thus, the arbitrator found that Thompson's comments about women "had a negative effect on his students and were contrary to established College policies which prohibited discrimination and harassment" and that an academic institution "should not have to tolerate such behavior at the expense of its students."

*[footnote continued on next page]*

Notice. In fact, the arbitrator specifically found that Thompson's conduct was likely to recur. (*Morrison*, *supra*, 194 Cal.App.4th at pp. 229-230.)

The fact that Thompson had no remorse and seemingly would not change his behavior, and his gender bias, was not mitigated by the student evaluations or good faculty reviews. The arbitrator did not provide his reasoning for finding that despite Thompson degrading women in class, trying to influence a student to drop charges against him, and making a false claim to an investigator, and specifically finding that Thompson had no remorse, that the positive evaluations from other students and good faculty reviews were relevant to mitigate such behavior. That some students were not offended by Thompson in no way mitigated the impact his behavior had on the students who were upset by comments made by Thompson. The arbitrator noted also that not all of the charges were sustained. However, the charges that were sustained warranted serious discipline.[16]

Sufficient evidence was presented that Thompson degraded women in class and tried to influence a student who had filed a complaint. Angela testified that she felt

---

These findings are not challenged here. At this stage, the relevance of Thompson's absolutist view about his academic freedom is simply that it provided no indication that he was willing to consider curbing even classroom conduct found to be harassing.

[16] The dissent contends the arbitrator "could reasonably find no significant likelihood of reoccurrence." The dissent further argues that the arbitrator did not make a specific finding on recurrence. (Dissent at p. 4.) However, the record supports that the arbitrator did find a likelihood of recurrence. The arbitrator specifically stated that he had found that all the *Morrison* factors were supported by the evidence, which included likelihood of recurrence. We rely on the detailed findings in the arbitrator's decision rather than what the arbitrator "could" have found.

degraded.  Casella testified that such degrading comments could cause depression and anxiety.  Some students were apparently not impacted by Thompson's comments, but that did not mean the impact on the students who testified at the arbitration hearing was any less.  The arbitrator found Thompson unfit to teach but failed to give import to the factors—including the chance of recurrence and the impact on his students—in reaching his decision to only impose a suspension.

Thompson contends that the arbitrator never found that Thompson had a temperamental defect, which was required for him to be dismissed.  In *Woodland Joint Unified School District v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429 (*Woodland*), the court addressed a seemingly different analysis to the *Morrison* factors.  The appellate court in reviewing the trial court's grant of a petition for writ of mandate ordering termination of a teacher, addressed the meaning of "Evident Unfitness for Service" within the meaning Education Code section 44932.  (*Woodland*, at p. 1441.)  The court noted, " 'evident unfitness for service' " . . . means 'clearly not fit, not adapted to or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies.'  Unlike 'unprofessional conduct,' 'evident unfitness for service' connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district."  (*Id.* at pp. 1444-1445, fn. omitted.)  If an analysis of the *Morrison* criteria indicates a teacher is unfit for service, "the next step is to determine whether the 'unfitness' is 'evident'; i.e., whether the offensive conduct is caused by a defect in temperament."  (*Woodland*, at p. 1445.)

Here, it is not clear that the arbitrator considered whether Thompson suffered from a temperamental defect. However, the purpose of such determination is a finding of "a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district." (*Woodland*, *supra*, 2 Cal.App.4th at p. 1444.) Here, the arbitrator concluded that Thompson had a certain "arrogance" about him when he told his students that tenure gave him the right to do whatever he wanted. Thompson accepted no responsibility and showed no remorse. Further, he ignored the directives in the 90-Day Notice. Th arbitrator found that Thompson was gender biased. Nothing in the evidence supports that Thompson would change his beliefs. This supported that Thompson was arrogant and gender biased, character traits that were not likely to be changed despite the findings of the actions of the District or a 90-day suspension. Thompson had exhibited these behaviors since at least 2013. As such, the evidence supports evident unfitness as defined in *Woodland.*

Finally, Thompson contends that some of the misconduct alleged against him was protected by the First Amendment. However, in the trial court, Thompson did not file his own petition for writ of mandate claiming that the arbitrator's findings were incorrect or contesting the 90-day suspension. (*Wood v. Superior Court of San Diego* (2020) 46 Cal.App.5th 562, 588, fn. 5.) As such, he has waived any claim that the arbitrator's findings were incorrect.

In sum, in imposing discipline against Thompson, the arbitrator recognized that Thompson had no remorse and that he took no responsibility for his actions. Not once did Thompson express sympathy for his students. The arbitrator concluded that

56

Thompson had made degrading comments about women, he lied to an investigator and tried to convince one of his students to drop a complaint against him. As for the degrading comments about women that Thompson made in class, the arbitrator concluded that "[a]n academic institution should not have to tolerate such behavior at the expense of its students." Thompson refused to comply with the 90-Day Notice, he offered the controversial video as extra credit despite knowing that it caused an uproar on campus when he emailed it to faculty, and he was dishonest.

Despite these findings, the arbitrator decided to return Thompson to the classroom without identifying any reason why Thompson's behavior would change as there was no indication he would be provided any training or tools to change his behavior. As the arbitrator found, there was a likelihood that Thompson would repeat his behavior, and Thompson's lack of remorse underscores that likelihood, as our record nowhere shows any commitment by him to change. The College should not be expected to allow Thompson to teach classes with the fear that he would repeat his past behaviors. Under the unique circumstances of this case, the arbitrator abused its discretion by failing to give proper weight to the possibility of recurrence and the impact on Thompson's students. The proper penalty was dismissal.

## DISPOSITION

The judgment is reversed.  The superior court is directed to issue a writ of mandate instructing the arbitrator to set aside its penalty decision of a 90-day suspension and render a decision dismissing Thompson.  Each party is to bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

J.

I concur:

RAPHAEL _____

J.

[*Riverside Comm. College Dist. v. Biersmith; Thompson*, E073818]

RAMIREZ, P. J.

I respectfully concur in part and dissent in part.

## I

## IMPOSING A SUSPENSION WAS NOT AN ABUSE OF DISCRETION

I agree that the District[1] has forfeited any challenge to the arbitrator's factual findings.  (Maj. opn. at p. 44, fn. 13.)  I also agree that "even if the arbitrator finds each of the *Morrison* factors are evident, he still has the discretion to impose discipline short of a dismissal."  (Maj. opn. at pp. 45-46.)  However, I do not agree that the arbitrator abused his discretion by ruling that the appropriate penalty was a 90-day suspension rather than dismissal.  (Maj. opn. at pp. 44-57)

Key to my decision is the highly deferential standard of review.

"Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. [Citation.]"  (*Barber v. State Personnel Board* (1976) 18 Cal.3d 395, 404.)  "Judicial review of an agency's assessment of a penalty is limited, and the agency's determination will not be disturbed in mandamus proceedings unless there is an arbitrary, capricious or patently abusive exercise of discretion by the agency.  [Citation.]"  (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 279.)

---

[1]  I use the same defined terms as does the majority opinion.

The abuse of discretion "'"' . . . must appear very clearly before the courts will interfere." [Citations.]' [Citation.]" (*Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 218.)  "If reasonable minds may differ with regard to the propriety of the disciplinary action, no abuse of discretion has occurred.  [Citation.]" (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners*, *supra*, 148 Cal.App.4th at p. 279.)  This is true even if the penalty seems to be too harsh or too lenient in the court's opinion.  (*Landau v. Superior Court*, *supra*, at p. 221.)

"'An abuse of discretion occurs where . . . the administrative decision manifests an indifference to public safety and welfare.  "In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated, is likely to result in, '[h]arm to the public service.'  [Citations.]  Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence."  [Citation.]  The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.'  [Citation.]" (*Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716, 721.)

The majority astutely focuses on the two key issues in this case:  The nature of the harm shown, and the likelihood of recurrence.  (Maj. opn. at p. 54.)  If the evidence conclusively showed that Thompson "'place[d] people at risk of injury'" (maj. opn. at

2

p. 52), and if it also conclusively showed a likelihood of recurrence, then dismissal was the only possible penalty. But if not, then not.

The arbitrator found that the bulk of the allegations against Thompson were *not* true. He found that Thompson did not discriminate against Krista based on a perception that she was gay or LGBT-affiliated. He found that Thompson did not discriminate against Derian based on her sexual orientation. He rejected Dr. Hendrick's claim that Thompson's comment about a "sword" was a physical threat. He further found that Thompson did not discourage students from expressing views that were different from his. He declined to consider incidents that occurred before the issuance of the 90-Day Notice, on the ground that "[t]hose shortcomings and corresponding corrective action were already addressed in that transmittal."[2]

He did find that Thompson had tried to get Derian to drop her complaint and had made a false statement to the investigator — namely, that he was unaware of the status of Derian's complaint. It must be remembered, however, that he did so under the stress of an investigation based on Derian's allegations, which the arbitrator eventually found to be false. Moreover, his false statement does not appear to have been material to the investigation. In any event, this was not conduct in the classroom; it did not reflect on his fitness to teach — at least not any more than would any other general moral turpitude.

---

[2]     A recitation of the evidence underlying these charges is therefore irrelevant to the arbitrator's choice of penalty.

3

Certainly it was not an abuse of discretion for the arbitrator to find that it called for a suspension rather than dismissal.

This leaves only the finding that "Thompson made statements derogatory towards women . . . ." As to this finding, the arbitrator could reasonably find that neither "the chance of recurrence" nor "the impact on [Thompson's] students" (maj. opn. at p. 54) required dismissal.

A.      *Likelihood of Recurrence.*

First, the arbitrator could reasonably find no significant likelihood of recurrence.

The arbitrator did not make any express finding that Thompson's conduct *was* likely to recur. (But see maj. opn. at p. 53.)[3] Rather, he found that "there appeared to be a lack of remorse or acceptance of responsibility on Thompson's part," which he deemed an "aggravating circumstance[]." This was a description of Thompson in the past; it was not a finding that, even after a 90-day suspension, Thompson would be unable to change his behavior in the future. To the contrary, by stating that "Thompson owes it to his future students . . . to present a wider and/or more balanced approach in his course

---

    [3]      The arbitrator did find that all of the *Morrison* factors were satisfied. The *Morrison* factors, however, go to primarily whether there is cause for discipline, not so much to what discipline is appropriate. (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229; *Ricasa v. Office of Administrative Hearings* (2018) 31 Cal.App.5th 262, 285.) The arbitrator could reasonably find that there was some likelihood of recurrence if Thompson received no discipline at all, but no likelihood of recurrence if Thompson received a 90-day suspension. As he could make such a finding — and as it would support his decision — we must assume he did so find.

4

presentations," and by ordering a suspension rather than dismissal, the arbitrator implicitly found that Thompson *could* use a "more balanced approach" in the future.

This implied finding was supported by substantial evidence. Thompson agreed that he was "not to make statements in class that denigrate women." He further agreed that he was "prohibited from making statements in class to the effect that women should not be out of their home . . . ." He acknowledged that he should not "denigrate" women or present "negative stereotypes" of women unless his statements were supported by academic research. Thompson denied either believing or "advocating" that women with children should not work. While the arbitrator found that this denial was false, it showed that he was not stubbornly insisting on expressing gender bias in the classroom.

The arbitrator did find that, even after receiving the 90-Day Notice, Thompson continued to make gender-biased statements. The 90-Day Notice found that he had made gender-biased statements and directed him not to do so in the future. At the same time, however, the District made a formal determination that "no violation of District Policy or Administrative Procedure occurred." Thompson testified that he was "perplexed" by the seeming contradiction. He also felt that the very general directives in the 90-Day Notice did not give him clear guidance. Moreover, the 90-Day Notice stated, "The Administration will assist you in overcoming these deficiencies." As the arbitrator found, however, the administration never did so.

The arbitrator therefore concluded that the 90-Day Notice was "misleading." He further found that the administration's failure to follow up with Thompson was

5

"mitigating." Thus, the arbitrator could also properly find that Thompson's failure to comply fully with the directives in the 90-Day Notice was *not* evidence that he was likely to continue to fail to comply in the future.

Thompson showed no "remorse" in part because he sincerely maintained that his classroom speech was protected by academic freedom under the First Amendment.[4] The arbitrator found that some of Thompson's allegedly gender-biased statements were "within the bounds of free expression and academic freedom," because they were supported by academic research, but that others were not.[5] The arbitrator could reason that, now that Thompson had obtained a ruling on the scope of his First Amendment rights, he would comply with it.

---

[4] The majority says that "Thompson . . . felt his . . . right to academic freedom allowed him to discuss controversial subjects even if it upset students. He felt his academic freedom allowed him to offend his students." (Maj. opn. at p. 53.) He did, and he was correct — the District could not limit his speech based on student offense alone. (See *Snyder v. Phelps* (2011) 562 U.S. 443, 458 ["'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.'"]; *Demers v. Austin* (9th Cir. 2014) 746 F.3d 402, 411-413 [academic employee speech is protected under the First Amendment].)

[5] The arbitrator specifically found that Thompson's statement that women "are prone to be catty" was not protected speech because there was no "academic debate" about it. This was erroneous; in his testimony, Thompson specifically cited support for it in the academic literature. (See T. Ghose, *Mean Girls: Women Evolved to Be Catty?* (Oct. 27, 2013), available at https://www.livescience.com/40717-indirect-aggression-between-females-works.html, as of Oct. 15, 2021; T. Vaillancourt, et al., Abstract, *Intolerance of Sexy Peers: Intrasexual Competition Among Women* (Sept. 19, 2011), available at <https://pubmed.ncbi.nlm.nih.gov/21932332>, as of Oct. 15, 2021.)

I agree with the majority that Thompson cannot challenge this finding now because he failed to cross-petition below. (Maj. opn. at pp. 55-56.) Nevertheless, the evidence shows that Thompson's First Amendment rights were genuinely under attack.

In a criminal case, the defendant's lack of remorse is not aggravating unless the defendant admits guilt (or the evidence of guilt is not in conflict). (*People v. Key* (1984) 153 Cal.App.3d 888, 900.) This is because lack of remorse is relevant to show a likelihood of recurrence only when a defendant acknowledges guilt, not when the defendant maintains his or her innocence. (*Id*. at p. 900.) The arbitrator could reason similarly that Thompson's lack of remorse, although an aggravating factor, did not show a likelihood of recurrence.

Finally, in evaluating the likelihood of recurrence, the arbitrator had the benefit of observing Thompson while he testified. "'"[A]n administrative hearing officer's proposed decision is entitled to great weight because of his [or her] opportunity to observe the witnesses and weigh their testimony in light of their demeanor."'" [Citation.]" (*County of Sonoma v. Gustely* (2019) 36 Cal.App.5th 704, 712, italics omitted.)

B.      *Impact on Students*.

Second, the arbitrator could reasonably find that Thompson's gender-biased statements did not have a significant impact on his students. To the extent that there was conflicting evidence on this point — and to the extent that conflicting inferences could be drawn from the evidence — we must view the evidence in the light most favorable to the arbitrator's choice of discipline.

Certainly several students testified that they found Thompson's gender-biased statements to be "offensive" or "degrading." However, offense alone is not necessarily

7

harm. There was no evidence that any student dropped out of school, or even dropped out of Thompson's class, as a result of any gender-biased statements.

The arbitrator was not bound by Casella's testimony that gender-based harassment "could" cause "anxiety, depression, difficulty concentrating, possibly even appetite/sleep disturbance, poor self-esteem," when none of Thompson's students reported any such conditions.

The record does not show that any student actually cried while testifying at the arbitration.[6] (But see maj. opn.at p. 53.) Apparently Derian got upset while testifying, but only while discussing the conversion therapy video and Thompson's email to her. Angela got "emotional" about the conversion therapy video. No student displayed any emotional distress resulting specifically from Thompson's gender-biased statements. Again, the arbitrator was able to observe the students' demeanors while testifying. We must accept his implied findings.

Witnesses also claimed to have been upset by things that the arbitrator found never actually happened. For example, Krista cried because she felt that Thompson was targeting her for her LGBT affiliation; the arbitrator found that Thompson never did so. Likewise, Angela testified that Thompson's gender-biased statements discouraged her from voicing her own views in class, but the arbitrator found that "Thompson did not discourage students from presenting in

---

[6] The District asserted in its closing arbitration brief that "[s]everal students became emotional and cried as they testified during the arbitration." However, "'[i]t is axiomatic that argument is not evidence.' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 961, fn. 10.)

8

his class points of view that were different from his . . . ." Dr. Hendrick claimed he was upset by Thompson's comment about a "sword," even though immediately afterward, Thompson's attorney said, "He doesn't mean a real sword," and Thompson added, "Of course not. I've always liked you. This is not personal." At the arbitration, Dr. Hendrick even admitted that Thompson's attorney "got us all squared away by indicating that the sword was a metaphor for something else." Hence, the arbitrator was entitled to discount any claims that students were upset by Thompson's gender-biased statements.

This bring me to the elephant in the room: A reasonable fact-finder could conclude that the witnesses against Thompson were biased. Administrators, professors, LGBT students, and their allies were up in arms over Thompson's airing of the conversion therapy video in 2014. After the college investigated this but imposed no discipline other than sensitivity training, people started coming out of the woodwork to accuse Thompson of similar sins. Most of them were members of the ALLY program (Krista and Dr. Steinback) or the Diversity Committee (Sergio, Angela, Victor, Dr. Broyles).

It was in this context that, as the arbitrator properly found, Thompson's faculty and student evaluations were mitigating.[7] Those evaluations tended to show that Thompson's accusers' hindsight claims of harm were overblown.

---

[7] The District contends that these evaluations were inadmissible hearsay. The parties stipulated, however, that the evaluations were admissible.

9

Fellow faculty members had visited Thompson's classroom, including one who visited a session on "sexism and a sexist society, gender role and gender identity, biological-based vs. social-based inputs into gender, whether males and females are just 'naturally' female and male", but they reported no inappropriate comments.

Thompson's student evaluations were "all great." One fellow faculty member commented, "Personally, I'd say that when the lowest rating was 58% in the 'Outstanding' category, Mr. Thompson must be doing something right." A majority of students said that he had no weaknesses. No student reported any gender bias — apparently not even Krista, who was in his class at the time of the evaluations. One student specifically said that Thompson had "[n]o bias toward [the] material."

The arbitrator had doubts about the credibility of Thompson's accusers, as shown by his findings that most of the charges against Thompson were not true. On this record, he could reasonably find that Thompson did make some gender-biased statements — but not all of the ones alleged. He could also give very little weight to any claims that the gender-biased statements that Thompson did make adversely affected anyone.

II

THE APPELLATE DISENTITLEMENT DOCTRINE APPLIES

Even apart from the merits, I would dismiss based on the appellate disentitlement doctrine. The District flagrantly disobeyed the arbitrator's decision, even after the trial court reaffirmed it. I see no reason not to apply the doctrine.

10

"'An appellate court has the inherent power, under the "disentitlement doctrine," to dismiss an appeal by a party that refuses to comply with a lower court order.' [Citation.] "'Appellate disentitlement 'is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction . . . .' [Citation.]" [Citation.]  No formal judgment of contempt is required; an appellate court "may dismiss an appeal where there has been *willful disobedience or obstructive tactics*. [Citation.]" [Citation.]  The doctrine "is based upon fundamental equity and is not to be frustrated by technicalities."' [Citation.]

"The 'disentitlement doctrine "is particularly likely to be invoked where the appeal arises out of the very order (or orders) the party has disobeyed."' [Citation.] '[T]he merits of the appeal are irrelevant to the application of the doctrine.' [Citation.]" (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 166.)

Here, the arbitrator's decision had the force of a decision of an administrative agency.  (See Ed. Code, § 87675 [incorporating portions of the Administrative Procedure Act].)  The arbitrator has "complete and sole jurisdiction over the matter." (Ed. Code, § 87674.)  "The arbitrator shall determine whether there is cause to dismiss or penalize the employee.  If the arbitrator finds cause, the arbitrator shall determine whether the employee shall be dismissed, the precise penalty to be imposed, and whether the decision should be imposed immediately or postponed . . . ."  (Ed. Code, § 87675.)

Subject to exceptions not applicable here, the arbitrator's decision "become[s] effective 30 days after it is delivered or mailed to respondent unless . . . a stay of

11

execution is granted." (Gov. Code, § 11519; see also Ed. Code, § 87675 [incorporating, inter alia, Gov. Code, § 11519].) The District's mandate petition did not automatically stay the arbitrator's decision. The District could have applied for a stay, but it did not. (Code Civ. Proc., § 1094.5, subds. (g), (h).)

The District asserts that "[a]n arbitrator's award is not directly enforceable; it must be enforced via a court proceeding." It cites Code of Civil Procedure section 1286, which allows a court to confirm, correct, or vacate an arbitration award. Also relevant are Code of Civil Procedure section 1287.4, which provides, "If an award is confirmed, judgment shall be entered in conformity therewith," and Code of Civil Procedure section 1287.6, which provides, "An award that has not been confirmed or vacated has the same force and effect as a contract in writing between the parties to the arbitration."

The flaw in this argument is that the arbitration here was not a contractual arbitration, which would be subject to the provisions of Code of Civil Procedure section 1280 et seq. It was a mandatory arbitration, subject to the provisions of Education Code section 87674 et seq. (See *Levinson Arshonsky & Kurtz LLP v. Kim* (2019) 35 Cal.App.5th 896, 904-907 [Code Civ. Proc., § 1280 et seq. does not apply to arbitration under the Mandatory Fee Arbitration Act, Bus. & Prof. Code, § 6200 et seq.].) Assuming Code of Civil Procedure section 1280 et seq. applied at all, it did not apply to the extent that it is inconsistent with Education Code section 87674 et seq. (See Code Civ. Proc., § 1859; *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 420 ["when a special and a general statute are in conflict, the former controls."].)

12

As noted, Code of Civil Procedure section 1286.7, provides that an unconfirmed award is effective as a contract. But when an arbitration is required by statute, not by contract, this makes no sense. Moreover, it conflicts with the specific finality provisions of Government Code section 11519, as incorporated by Education Code section 87675. Accordingly, the District's refusal to reinstate Thompson was a violation of a final and effective administrative order.

As if that were not enough, the trial court entered a final judgment denying the District's petition. The District's appeal did not automatically stay the judgment. Much as with the arbitrator's decision, the District could have sought a stay, but it did not. (Code Civ. Proc., § 1094.5, subds. (g), (h)(3) ["If an appeal is taken from a denial of the writ, the order or decision . . . shall not be stayed except upon the order of the court to which the appeal is taken."].) Accordingly, since entry of the judgment, the District's continuing refusal to reinstate Thompson has been a violation of a final and effective court order — the very court order from which it appeals.

The District retorts that Thompson "has not taken any legal action to challenge" the District's refusal to reinstate him. However, he had already successfully litigated the arbitration, in which the arbitrator ordered that he be reinstated; he had already successfully litigated the mandate proceeding, in which the trial court upheld the arbitrator's order. How many times must he prevail before the District will obey?[8] In

_____

[8] The District's assertion that the arbitrator's decision was unenforceable unless and until it was confirmed under Code of Civil Procedure section 1286 makes me wonder: What did the District intend to do if we affirmed the judgment? Did it intend to

*[footnote continued on next page]*

13

this appeal, Thompson is invoking the disentitlement doctrine. That is a sufficient challenge.

Thus, I reject the District's only argument — that it has not violated any order. It does not argue that, if it did violate an order, the violation was not willful. The failure to obey an order is willful when the party is aware of the order, has the ability to comply, and knowingly and intentionally does not comply. (*In re Aguilar* (2004) 34 Cal.4th 386, 389.) Here, the District was aware, first, of the arbitrator's decision, and then, of the trial court's judgment. It had the ability to reinstate Thompson. Nevertheless, it knowingly and intentionally failed and refused to do so. Its counsel took the position that it did not have to, because it was going to file (or had filed) this appeal, but that position was frivolous. Its counsel did not take the position, at least at that time, that the arbitrator's order had to be confirmed in order to be enforceable. In any event, that position, too, is frivolous. The District's noncompliance was persistent; it violated two separate rulings, nine months apart. Even after we raised the issue of the disentitlement doctrine, the District still did not offer or agree to reinstate Thompson. Thus, it satisfactorily appears that the District's violation was willful.

Finally the equities favor Thompson, rather than the District, in light of the significant differential in power and resources between them. It has been nearly three years since the arbitrator's decision. During this time, not only has Thompson been

---

disregard our opinion, too, on the ground that the arbitrator's decision has never been confirmed?

unable to work for the District, he has been unable to work as a teacher anywhere, because the District's charges have been hanging over his head. The District argues that it needed "to protect its . . . students from further misconduct directed at them from Mr. Thompson." If so, it should have sought a stay. Self-help under these circumstances is not allowed.

RAMIREZ

P. J.
